# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Jennifer Rogers Bergmann,<br><br>                                                    Debtor.<br><br>E. Perry Burrus, III, Lake Como, LLC,<br><br>                                                    Plaintiffs,<br><br>v.<br><br>Jennifer Rogers Bergmann,<br><br>                                                    Defendant. | C/A No. 16-02250-DD<br><br>Adv. Pro. No. 16-80113-DD<br><br>Chapter 7<br><br>**ORDER** |

Jennifer Rogers Bergmann ("Defendant") filed a voluntary petition for relief under chapter 7 of the bankruptcy code on May 4, 2016.  E. Perry Burrus III and Lake Como, LLC ("Plaintiffs") filed a complaint asserting causes of action under 11 U.S.C. § 523(a)(2), (4), and (6) arguing Plaintiffs' claims are non-dischargeable.  Trial was held on May 30-June 1, 2018.  Jurisdiction is premised upon 28 U.S.C. §§ 1334 and 157(a).  Venue is proper under 28 U.S.C. § 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

## **FACTS**

1. Defendant, the debtor in the underlying case, is an individual and resident of South Carolina.

2. Plaintiff, E. Perry Burrus, III is a resident of South Carolina.

3. Lake Como, LLC is a South Carolina Limited Liability Company.  Burrus is one of the members of Lake Como.

4. Defendant filed a voluntary petition for relief under chapter 7 of the bankruptcy code on May 4, 2016, and listed Plaintiffs as creditors with unknown balances in her schedules.

5. Defendant was the manager of two manager-managed limited liability companies, namely Docks Shell, LLC ("Docks") and Sand Hill Stations of Bluffton, LLC ("Sand Hill") (collectively the "LLCs"). Both LLCs were engaged in the business of owning and operating gas stations in Beaufort County, South Carolina.

6. Defendant formed, held a financial interest in and controlled JTKT, LLC and JK Developers LLC.

7. Sand Hill was established on May 17, 2010. The initial members of Sand Hill were JK Developers, LLC, Timothy Dolnik, and Edward LeGrand Lowther. The initial capital contribution called for by the Operating Agreement was $474,500, including $400,000 from JK Developers. Dolnik contributed $74,500 in cash. Lowther's capital contribution was made in the form of agreeing to provide a lien on property to secure a company loan.

8. Charles Scarminach drafted the operating agreements for Sand Hill and Docks. Mr. Scarminach testified that Defendant provided him with the information for the operating agreements, including the amount of capital contribution for each member.

9. Burrus and his wife, a relative of Defendant, approached Defendant in April 2011 about investing in a gas station business.

10. Docks was created on August 22, 2012. Docks' operating agreement indicated capital contributions of:

    a. JTKT, LLC: $225,000

2

    b. J2R2, LLC: $110,000

    c. Lake Como, LLC: $110,000

    d. Trust Holding Company, LLC: 110,000

JTKT was owned by Defendant. J2R2 was owned by Mr. and Mrs. Rodgers, Defendant's Father and Step-Mother. Trust Holding Company was owned by Charles Aimar, Defendant's Step-Uncle.

11. Burrus testified that before Lake Como invested in Docks, Defendant told him Sand Hill was successful and that Defendant would be investing her own money into Docks.

12. Sand Hill purchased Lowther's membership interest on February 17, 2013. Sand Hill transferred a membership interest to Lake Como on March 6, 2013. Lake Como agreed to purchase the membership interest for $150,000. $50,000 was payable upon execution of the membership transfer agreement. Upon full payment of the $150,000, Sand Hill would transfer a 20% membership interest in Sand Hill to Lake Como.

13. Sand Hill's operating agreement required a unanimous vote by the members to admit a new member. Timothy Dolnick testified that he did not know that Sand Hill had redeemed Lowther's membership interest or that the membership interest had been purchased by Lake Como.

14. Burrus testified that Defendant indicated to him that Sand Hill was successful and profitable, and that the partners were taking approximately $25,000-$30,000 per year in cash distribution though profit sharing. In an email to Burrus discussing Burrus' potential investment into Sand Hill, Defendant stated that Sand Hill owned real

estate valued at $2.9 million, the business was valued at $750,000, and the debt on the entire company was $1.7 million.

15. The LLCs' operating agreements required approval by 100% of the membership interest for "any borrowing by the Company under any loan or series of related loans in excess of Fifty Thousand and No/100 ($50,000.00) Dollars," and for "any contract or transaction between the Company and the Manager or between the Company and any other limited liability company, corporation, partnership, association, or other organization which the Manger is the Manger, or officers or shareholders, or members thereof or have a financial interest therein [sic]."

16. Defendant testified that both Sand Hill and Docks constantly had cash flow issues and the bank accounts were over drafted on numerous occasions. Defendant testified that she constantly took out loans from friends and family to supplement the cash flow. Defendant testified that she also moved money between Sand Hill and Docks accounts as needed to cover expenses.

17. Defendant testified that to pay back these loans she often wrote checks from Sand Hill and Docks accounts to herself or other LLCs that she owned. She would then cash the check and repay the loan.

18. Between June 26, 2014 and July 28, 2014, Defendant wrote checks to JTKT, LLC from Sand Hill's account totaling $536,875.42.

19. Between January 2, 2013 and December 23, 2013, Defendant wrote checks to herself from Docks' account totaling $522,453.81.

20. Each member of Docks and Sand Hill testified Defendant never approached them for approval of a transaction or series of transactions between Docks or Sand Hill and

    Defendant or companies controlled by or in which Defendant participated as member, officer, shareholder or manager.

21. Defendant signed Burrus' name on numerous personal guarantees. After Burrus was contacted by creditors who claimed he had personally guaranteed the accounts, Burrus hired an attorney and contested these debts. He also testified that he did not personally pay any of the debts stemming from personal guarantees signed by Defendant. Burrus testified that he incurred an unspecified sum for attorney fees in defending the guaranty claims.

22. On February 3, 2015, Burrus filed a lawsuit against Defendant seeking damages caused by Defendant signing Burrus' name on the personal guarantees. On February 11, 2016, the Beaufort County Court of Common Pleas dismissed the lawsuit on the grounds that South Carolina law does not recognize a civil cause of action for forgery. Burrus appealed the dismissal to the South Carolina Court of Appeals on the ground that South Carolina law should recognize such a cause of action. The appeal was stayed upon the filing of Defendant's bankruptcy petition.

## ANALYSIS

Plaintiffs seek a determination that Defendant is not entitled to discharge any debt owed to them pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6). The plaintiff has the burden of proving an objection to dischargeability under § 523 by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654 (1991). Once the plaintiff makings a *prima facie* case, the burden of proof shifts to the debtor to offer credible evidence to satisfactorily explain his conduct. *See Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249-50 (4th Cir. 1994) (holding the burden of proof shifts in actions under § 727);

*see also Winston-Salem City Employees' Federal Credit Union v. Casper*, 466 B.R. 786, 793 (Bankr. M.D.N.C. 2012) (applying the burden shifting framework to § 523(a)). "The exceptions to discharge were not intended and must not be allowed to swallow the general rule favoring discharge." *In re Bleam*, 356 B.R. 642, 647 (Bankr. D.S.C. 2006) (quoting *In re Cross*, 666 F.2d 873 (5th Cir.1982)). Thus, exceptions to discharge are narrowly construed.

   A. **Section 523(a)(4)**

Section 523 of the bankruptcy code prohibits the discharge of an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity. See 11 U.S.C. § 523(a)(4). In order for Plaintiffs to prevail under § 524(a)(4), it must be proved (1) that the debt in issue arose while Defendant acted in a fiduciary capacity and (2) the debt arose from her fraud or defalcation. *See Pahlavi v. Ansari* (*In re Ansari*), 113 F.3d 17, 20 (4th Cir.1997) ("In order to prove a debt is non-dischargeable under § 523(a)(4) of the Bankruptcy Code, a creditor must prove the debtor committed '[1] fraud or defalcation {2} while acting in a fiduciary capacity.'").

Plaintiffs allege Defendant owe Plaintiffs a debt arising from her fraud or defalcation while acting in a fiduciary capacity. Plaintiffs seek the determination of non-dischargeability as to the initial investment, other monies allegedly removed from the LLCs by Defendant, and other sums. Plaintiffs allege 11 U.S.C. § 523(a)(4) prohibits discharge of this indebtedness. Specifically, Plaintiffs allege that there was a fiduciary relationship between Plaintiffs, as a member of the LLCs, and Defendant, as manager of the LLCs. Lake Como was a member of the LLCs, Burrus was not.

1. **Defalcation**

"Defalcation" is an intentional breach of trust and misappropriation of funds. *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74, 133 S.Ct. 1754, 1759 (2013). "Where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id*. "Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id*. Defalcation "may be used to refer to *nonfraudulent* breaches of fiduciary duty." *Id*. 569 U.S. at 275, 133 S.Ct. 1760.

"Although the Court [in *Bullock*] stated that 'fraud' and 'defalcation' should be 'treated similarly,' it does not follow that defalcation requires a finding of fraud…. treating 'defalcation' and 'fraud similarly means only that 'defalcation' must require something more than negligence." *In re Cobham*, 551 B.R. 181, 199 (E.D.N.C. 2016).

Plaintiffs provided evidence of numerous payments from accounts belonging to Docks and Sand Hill to Defendant's personal accounts or accounts of companies owned by Defendant. These payments constitute defalcation, because they were a misappropriation of company funds; she paid funds to herself and her other companies in contravention of the operating agreements. The state of mind requirement imposed by the Supreme Court in *Bullock* was established in this case. Defendant's conduct and the circumstances surrounding her conduct show the Defendant acted with actual knowledge that her actions were improper. The operating agreement for both Docks and Sand Hill required approval of

7

100% of the membership interest for "any contract or transaction between the Company and the Manager or between the Company and any other limited liability company, corporation, partnership, association, or other organization which the Manger is the Manger, or officers or shareholders, or members thereof or have a financial interest therein." Defendant know this because she directed the drafting of the operating agreements and they made clear to Defendant that any transaction between herself and any other limited liability company that she owned, required approval of 100% of the membership interest.

Defendant provided no justification or explanation for the transactions that was supported by credible evidence. Defendant testified that the transfers were likely to repay loans made to the LLCs from various parties, and that it was easier to transfer the money to herself prior to repaying the loans. Defendant offered no evidence of these alleged loans, other than her own testimony. Further, even if these transactions were for the repayment of loans, the transactions were still a breach of the operating order. The other members of Docks and Sand Hill testified that Defendant never approached them for approval of these transactions which they suggest constitute at minimum a conflict of interest.

The Court finds Lake Como is owed a debt arising from Defendant's defalcation, by misappropriating funds of Docks and Sand Hill with knowledge that the transactions violated a fiduciary duty.

**2. Fiduciary Capacity**

"An actionable defalcation for purposes of applying § 523(a)(4) arises only in the context of a fiduciary relationship and apart from its existence within the bounds of a fiduciary relationship, defalcation has no meaning under the Bankruptcy Code." *Bleam*, 356 B.R. at 649. The definition of "fiduciary" for purposes of §523(a)(4) is controlled by federal

8

common law. *See Id*. "Under the federal common law, the term 'fiduciary' is limited to instances involving express or technical trusts." *In re Aman*, 498 B.R. 592, 603 (Bankr. N.D.W.V. 2013). A "technical or express trust requires there be a 'fiduciary duty' with trust-type obligations that are imposed under state or common law." *Id*. at 604. The existing precedent in the United States Court of Appeals for the Fourth Circuit requires this narrow interpretation of fiduciary. *See Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493 (4th Cir. 2008).

While the definition of fiduciary duty is found in federal law, resort to state law is appropriate to determine whether a trust obligation exists. *See Bleam*, 356 B.R. at 649. "The existence of a state statue or common law doctrine imposing trust-like obligations on a party may, at least in some circumstances, be sufficient to create a technical trust relationship for purposes of section 523(a)(4)." *Aman*, 498 B.R. at 604 (quoting 4 *Colliers on Bankruptcy* ¶ 523.10[1][d] (Alan N. Resnick & Henry J. Sommer, eds. 15th ed. Rev. 2009)).

In *In re Frain*, the Seventh Circuit exempted from discharge a debt owed by a majority shareholder of a closely-held corporation to two minority shareholders incurred when the majority shareholder, as chief operating officer, paid shareholder distributions before shareholder loans, in violation of the shareholder agreement between the parties. 230 F.3d 1014 (7th Cir. 2000). The court found the debtor owed the minority shareholders a fiduciary duty, focusing on the practical realities of how the shareholder agreement placed the debtor in "considerable" or "substantial" ascendency over the minority shareholders. *Id*. at 1017-18.

9

In *In re McKnew*, the court addressed the dischargeability of a debt arising out of a chapter 7 debtor's misconduct, in his capacity as manager responsible for day-to-day operations of a factoring company, by making excessive and unauthorized draws of salary and misusing funds reserved for purchase of accounts receivable. *See In re McKnew*, 270 B.R. 593 (Bankr. E.D.Va. 2001). The court in *McKnew* examined the law of Virginia concerning the relationship of managers and members of a limited liability company to the company to assist in the determination as to whether the debtor acted in a fiduciary capacity for § 523(a)(4) purposes. The court determined that "no provisions of the Virginia L.L.C. Act appear to impose any trust upon funds contributed to a limited liability company for capital or otherwise, nor do provisions in any manner address the relationship between a manager and the monies of a limited liability company." *Id.* at 629. The court held no fiduciary relationship existed between the debtor and the company, because the Virginia L.L.C. Act did not impose a trust relationship concerning the monies of a limited liability company.

Unlike in *McKnew*, the South Carolina Uniform Limited Liability Company Act does impose a trust relationship concerning the monies of a limited liability company. S.C. Code Ann. § 33-44-409(h)(2) states "In a manger-managed company: (2) a manager is held to the same standards of conduct prescribed for members in subsections (b) through (f)." Section 33-44-409(b)(1) imposes a duty of loyalty and requires a manger "(1) to account to the company and to hold as **trustee** for it any property, profit, or benefit derived by the member in the conduct…of the company's business…." (emphasis added). Therefore, there is a specific statutory imposition of a trust relationship.

Defendant was the manager of Docks and Sand Hill. The South Carolina Code imposed a trust relationship between Defendant, as manager, the LLCs, and the other members of the LLCs. As a manager of Docks and Sand Hill, Defendant owed a fiduciary duty to the members. While that duty did not arise from an "express" trust, it did arise from a special relationship created by statute and the operating agreements where Defendant was entrusted with certain powers and assets of the companies. In light of a manager's obligation to hold company property, profit or benefit in trust for the company, an obligation accepted by Defendant when she became the manager of the LLCs, the Court finds Defendant served in a fiduciary capacity. Lake Como was a member of the LLCs, but Burrus was not. Defendant owed the duty to Lake Como, not Burrus.

Having concluded Plaintiffs demonstrated by a preponderance of the evidence that a fiduciary relationship existed between Lake Como and Defendant, Defendant committed defalcation while acting in that fiduciary capacity, and Lake Como's debt resulted from the Defendant's defalcation, the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

### B. Sections 523(a)(2) and (6)

#### a. Lake Como

Plaintiffs also seek a determination that their debt is not dischargeable, pursuant to 11 U.S.C. § 523(a)(2) and (6). A determination of the dischargeability pursuant to § 523(a)(2) and (6) is unnecessary as to Lake Como, as the Court has determined the debt is nondischargeable pursuant to § 523(a)(4). Additionally, the existence of any other debt to Lake Como is not supported by evidence of a specific debt due to Lake Como from Defendant or the LLCs she managed.

11

### b. Burrus

Burrus seeks a determination that a debt is owed to him resulting from Defendant signing his name to personal guarantees, and that the debt is not dischargeable, pursuant to 11 U.S.C. § 523(a)(2). The bankruptcy code excepts from discharge any "money…to the extent obtained by…use of a statement in writing that is materially false, respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money…services, or credit reasonably relied; and that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B).

Burrus argues that Defendant submitted materially false writings to vendors of the companies she managed when she submitted personal guarantees with Burrus' forged signature as part of applications for credit, goods, money or services. Burrus further argues that the vendors reasonably relied on the documents respecting the financial condition of the companies and its members, the documents were published with the intent to deceive. Burrus is not the creditor to whom the debtor is liable for such money, the vendors would be the proper party.

Burrus failed to establish by a preponderance of the evidence that he is personally owed a debt. There was testimony that Burrus had to hire an attorney to avoid liability for the debts under the personal guarantees. However, there was no evidence of what was paid to the attorney. Burrus argues he was damaged in that his credit was harmed, but produced no evidence of a debt stemming from that damage. Burrus filed a lawsuit in state court regarding the forgeries, but it was dismissed as South Carolina law does not recognize a civil cause of action for forgery. Burrus argues Defendant made false misrepresentation to him that induced him to invest in the LLCs, but Lake Como invested in the LLCs not

Burrus.  The Court finds that Burrus failed to establish by a preponderance of the evidence that a debt for money, property, services, or an extension, renewal, or refinancing of credit is owed to him personally.

## CONCLUSION

Based on the foregoing, Lake Como's objection to the discharge of its investments under 11 U.S.C. § 523(a)(4) is granted.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**06/25/2018**



Entered: 06/26/2018

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

13